## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA

DERRIK HAGERMAN,         )
)
                    Movant,     )
)
         vs.              )       1:10-cv-272-LJM-DKL
)       IP 06-139-CR-01-M/L
)
UNITED STATES OF AMERICA.   )

### Entry Discussing Motion for Relief Pursuant to 28 U.S.C. ' 2255 and Denying Certificate of Appealability

A jury convicted Wabash Environmental Technologies ("WET") and its president, movant Derrik Hagerman, on ten counts of making materially false statements in reports WET was obligated to file under the Clean Water Act. Hagerman was sentenced to 60 months imprisonment and, along with WET, was ordered to pay $237,680 in restitution to the EPA to clean up the contamination they caused. On appeal, Hagerman challenged an evidentiary ruling and a jury instruction, and argued that the prosecution and the district court constructively amended the indictment. He also challenged the length of his sentence. These arguments were rejected. *United States v. Hagerman*, 301 Fed. Appx. 552 (7th Cir. 2008).

Hagerman now seeks relief pursuant to 28 U.S.C. ' 2255. His claims are ineffective assistance of counsel and newly discovered evidence. A court may grant relief pursuant to ' 2255 "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. ' 2255(a). Claims of ineffective assistance of counsel may be raised during a collateral challenge. *See Massaro v. United States,* 538 U.S. 500 (2003). Also, A[a]lthough res judicata does not apply in ' 2255 proceedings, >the court may still exercise its discretion not to reconsider issues already decided at trial, on direct appeal, or in prior ' 2255 proceedings.@ *Olmstead v. United States*, 55 F.3d 316, 319 (7th Cir. 1995) (quoting *Taylor v. United States,* 798 F.2d 271, 273 (7th Cir. 1986)).

# I. Background

The following facts are taken from the decision in Hagerman's direct appeal. *United States v. Hagerman*, 301 Fed. Appx. 552 (7th Cir. 2008).

WET operated a facility in Terre Haute, Indiana, that accepted industrial liquid waste, treated it, and discharged it into the Wabash River. The Indiana Department of Environmental Management ("IDEM") issued WET a National Pollutant Discharge Elimination System permit, which allowed WET to release the treated wastewater into the river but limited the type and amount of pollutants the wastewater could contain. The permit required WET to periodically test samples of the expelled wastewater to ensure that the pollutants did not exceed permitted levels. It also required WET to provide the state with monthly reports – Monthly Monitoring Reports ("MMRs") and Discharge Monitoring Reports ("DMRs") – disclosing, among other things, the results of all tests and whether any tests had shown pollutant levels higher than the permit allowed. The permit mandated that WET use testing procedures approved by the EPA. Hagerman was responsible for completing the reports and certifying, as the permit directed, that the information he provided was "true, accurate and complete."

At trial, Lahn Neill ("Neill") and Barry Morrison ("Morrison"), WET's lab technicians who were responsible for testing samples of the discharged wastewater for pollutants, testified about the procedures they used for analyzing the samples and recording the results in lab notebooks and on "bench sheets." Neill testified that after she and Morrison completed the bench sheets, she gave them to Hagerman. Copies of the bench sheets were entered into evidence and showed that, on the dates charged in the indictment, the levels of pollutants in WET's discharge wastewater exceeded permit levels. Hagerman, however, reported far lower levels on the company's MMRs and DMRs.

Throughout 2004 Neill's tests showed high levels of pollutants. When she would receive a particularly high result, she would bring the result to Hagerman, who accused her of performing her tests incorrectly. He told her that her "numbers" were too high and that he could not report them. He also told her that he had additional "information" that was not reflected in the testing results and so he ran her results through a "calculation" and concluded that the pollutant levels were within permit limits. According to Neill, in October 2004, Hagerman confronted her at her home and demanded that she give him all of her documentation and erase her electronic files. The next day Neill gave Hagerman a box of documents but retained copies. She did not delete her computer files. Later that week, Hagerman mentioned to Neill that there had been a fire in a dumpster behind the facility. Neill later turned over all of her documentation to the government.

Morrison testified that in early 2004 he became concerned that the levels of pollutants he was seeing in his lab results were higher than WET's permit limits. In March he created several charts showing the levels of pollutants relative to the permit levels and gave copies of these charts to Hagerman. He received no response. In September 2004 he gave Hagerman a similar chart. The next month, one of his test results was so high that he wanted Hagerman to see it immediately. Because Hagerman had left for the day, Morrison taped a note containing the result to Hagerman's office door. He again received no response.

Morrison testified that the machine used to test for the presence of one pollutant, phenol, was not working from June until September 2004. During that time, Morrison, who was responsible for phenol testing, did not perform these tests and left blank the space on the bench sheets reserved for recording the phenol test results. WET replaced the machine in September 2004, but Morrison had trouble learning how to use the new machine to perform the EPA-approved test; thus, throughout the fall of 2004 Morrison used the machine to run a different test, which was not approved by the EPA, to "get quick results." He testified that Hagerman knew he was using a method that was not approved by the EPA.

An EPA agent testified that agency officials searched Hagerman's office pursuant to a search warrant. Agents found bench sheets for 2004, but the numbers on these bench sheets did not match the numbers on the copies of the bench sheets Neill had provided to the government; they did, however, correspond to the results reported on the MMRs and DMRs. Agents also found copies of four electronic spreadsheets that were similar to those Neill kept to record her test results. They differed only in that Neill's version of the spreadsheets appeared to contain additional information.

Hagerman testified in his own defense. He acknowledged that he was responsible for completing the MMRs and DMRs and for certifying the accuracy of the test results he reported. He said that Neill and Morrison did not provide him with bench sheets and instead gave him their data on scraps of paper and post-it notes. Hagerman testified that he transferred this information onto bench sheets and threw out the scraps of paper. He said that Neill never reported test results showing any pollutants above WET's permit limits and denied reviewing the spreadsheets she created. He also testified that, when he received test results from Morrison showing elevated levels of pollutants, he would ask Morrison to explain how he performed the test. He would adjust the result to account for errors that he perceived in the testing process and for his knowledge about the kinds of waste WET's customers sent to the facility. He further testified that the lab notebooks, bench sheets, and spreadsheets showing test results inconsistent with those he reported on the MMRs and DMRs were fabricated by Neill and Morrison in an effort to frame him.

## II. Discussion

### A.    Ineffective Assistance of Trial Counsel

Hagerman's first claim is ineffective assistance of counsel. The Sixth Amendment guarantees a criminal accused the right to assistance of counsel, and "the right to counsel is the right to the effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970). The Supreme Court set forth the legal principles that govern claims of ineffective assistance of counsel in *Strickland v. Washington,* 466 U.S. 668 (1984). Under *Strickland,* a defendant must demonstrate both that his counsel's performance was deficient when measured against prevailing standards of professional reasonableness, and that the deficient performance prejudiced his defense. *Strickland,* 466 U.S. at 689-92; *Brown v. Finnan,* 598 F.3d 416, 422 (7th Cir. 2010) (citing *Wiggins v. Smith,* 539 U.S. 510, 521 (2003)).

With respect to the first prong, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Wiggins v. Smith,* 539 U.S. 510, 521 (2003) (quoting *Strickland,* 466 U.S. at 688). In determining whether counsel's performance was constitutionally deficient, the court's review of counsel's performance is "highly deferential," and the petitioner "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Davis v. Lambert,* 388 F.3d 1052, 1059 (7th Cir. 2004). With respect to the prejudice requirement, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694. It has been recognized, more recently, that to show prejudice a petitioner must demonstrate that the impact of errors either individually or cumulatively would have materially changed the outcome of the proceedings. *Porter v. McCollum,* 130 S. Ct. 447, 453 (2009). *Strickland* requires that counsel's performance be evaluated as a whole rather than focus on a single failing or oversight. *Peoples v. United States,* 403 F.3d 844, 848 (7th Cir. 2005). In this case, consideration of Hagerman's specifications of attorney error do not support his claim that his attorney was ineffective.

Hagerman asserts that his counsel was ineffective – for failing to use an expert witness, failing to use certain fact witnesses, and for failing to question witnesses regarding certain evidence.

### 1.    Failure to Investigate or Use Expert Witnesses

Hagerman first argues that his counsel was ineffective for failing to investigate the use of expert witnesses to aid in his defense. Hagerman argues that

expert testimony would have been used to show typical operation of a wastewater treatment plant including normal results for materials that were accepted by WET, characteristics of the effluent if the test results of Neill and Morrison were correct, deficiencies in Neill and Morrison's testing procedures and need for a QAQC book in laboratory testing.

"Complaints of uncalled witnesses are not favored in federal habeas review." *Montgomery v. Petersen*, **846 F.2d 407, 415 (7th Cir. 1988)** (quoting *Murray v. Maggio*, **736 F.2d 279, 282 (5th Cir. 1984)**); *see also Prewitt v. United States*, **83 F.3d 812, 819 (7th Cir. 1996)** ("[I]t is the rule of this Court that in order for a hearing to be granted, the petition must be accompanied by a detailed and specific affidavit which shows that the petitioner had actual proof of the allegations going beyond mere unsupported assertions.") (quoting *Barry v. United States*, **528 F.2d 1094, 1101 (7th Cir. 1976)**). "In order to establish prejudice resulting from a failure to investigate, the defendant must make 'a comprehensive showing of what the investigation would have produced.'" *Granada v. United States*, **51 F.3d 82, 85 (7th 1995)** (quoting *United States v. Balzano*, **916 F.2d 1273, 1296 (7th Cir.1990)**).

Hagerman provides no evidentiary support for his assertion that his trial counsel should have consulted or used expert witnesses. In reply in support of his motion, Hagerman presents the affidavit of Joseph Snodgrass, a purported expert on wastewater treatment plants. Snodgrass' testimony is intended to show that an expert witness would have benefitted Hagerman at trial by helping the jury to better understand the operation of a wastewater treatment plant. Snodgrass testifies that the wastewater treatment plant operator, or a person who is skilled in the area of wastewater treatment plant operation and knowledgeable about the operations of a particular wastewater treatment plant, can review the profiles of the various loads of wastewater that have come into a facility to make a determination of what contaminants are present in that wastewater treatment plant. The person can also acquire and relate a general idea of the concentrations of the various chemicals in the system given the information from the profiles and the general knowledge of the operation of that wastewater treatment plant.

Snodgrass does not address the testimony of the government's witnesses or provide support for Hagerman's trial testimony. It therefore provides little support for Hagerman's assertion that his trial counsel was ineffective in failing to investigate the use of expert witnesses. Hagerman did not have any records of test results to support the numbers that he reported to the government. In essence, he "dry-labbed" the results he reported. In his trial testimony, Hagerman claimed that the copies of the bench sheets and other documents from the technicians were fakes and that the technicians had actually reported to him the lower pollutant levels he had included in the required reports. He claimed that they had reported these numbers to him on "post-it notes and scraps of paper," and that he had not kept them.

As the Seventh Circuit explained, "[w]hat Hagerman knew when he completed the DMRs and MMRs was the central question at trial." *United States v. Hagerman*, 301 F. App'x 552, 556 (7th Cir. 2008). The evidence at trial showed that the lab technicians were reporting to Hagerman results in excess of permit levels. Hagerman's defense was that he had never received any test results showing unacceptable pollutant levels. A determination regarding whether Hagerman received these test reports but reported different levels did not require expert testimony. Therefore Hagerman's trial counsel was not ineffective for failing to investigate or use an expert witness.

### 2.     Failure to Investigate or Use Non-expert Witnesses

Hagerman next argues that his trial counsel was ineffective for failing to investigate the use of certain non-expert witnesses.

#### a.     Unnamed Former Employees

Hagerman alleges that his trial counsel was ineffective for failing to investigate and use former employees of WET as witnesses, but does not identify these former employees. He asserts that these unnamed witnesses would have testified that customers of WET "did not produce metals, and therefore, the metal results could have never been as high as what Morrison reported." He also alleges that former employees would have testified about how the lab technician's test results were typically given to Hagerman. This unsupported assertion that some unknown witnesses could have testified on his behalf is insufficient to establish ineffective assistance of counsel. *See Granada*, 51 F.3d at 85 (movant did not establish prejudice from failure to call additional witnesses when he did not identify who those witnesses were or what their testimony would have been); *Barkauskas v. Lane*, 946 F.2d 1292, 1295 (7th Cir. 1991) (the party must present evidence, not mere conclusory allegations, that counsel overlooked exculpatory testimony); *United States ex rel. Cross v. DeRobertis*, 811 F.2d 1008, 1016 (7th Cir. 1987) (when "allegation of ineffectiveness of counsel centers on a supposed failure to investigate, we cannot see how . . . the petitioner's obligation can be met without a comprehensive showing as to what the investigation would have produced").[1]

#### b.     Ray Cole

Hagerman next argues that trial counsel was ineffective for failing to investigate the dumpster fire which Neill implied contained lab materials. Neill testified that in October 2004, Hagerman confronted her at her home and demanded that she give him all of her documentation and erase her electronic files. The next day Neill gave Hagerman a box of documents but retained copies. She did not delete

---

1  In his reply in support of his motion, Hagerman presents for the first time the affidavit of Mike Cooper, a former WET employee. This affidavit is too late and does not provide sufficient testimony to support Hagerman's arguments.

her computer files. Later that same week, Neill testified that Hagerman joked that it was amazing that the company dumpster had been scorched in a fire.

Hagerman asserts that former WET employee Ray Cole would have testified that "the dumpster fire was actually caused by a grill being emptied into the dumpster setting it on fire and the dumpster was actually located in a different area than what was claimed by Neill." Cole's affidavit describes a dumpster fire "sometime in 2004" that started when another employee emptied the grill into the dumpster. He states "Derrik had shared in confidence with me . . . that Lahn said that he (Derrik) put the dumpster over by building 85 and put lab books in there and set them on fire. I would have know[n] about any fire on campus or moving of the dumpster to other locations to do the above."

The court does not find that the omission of Cole's testimony prejudiced Hagerman.[2] The evidence at trial was that Hagerman took documents from Neill and demanded that she erase her electronic files in October of 2004. That same week Hagerman made a comment to her regarding a dumpster fire. In his affidavit, Cole describes a fire that took place sometime in 2004 and it is unclear whether the two statements describe the same fire. In addition, even if the fire at issue was caused by someone other than Hagerman, this does not discredit testimony regarding Hagerman's comments on the fire. Further, to the extent that the dumpster fire was considered at sentencing, the court did not attribute it to Hagerman. As the court explained: "The evidence that I've heard about the dumpster fire is too far removed for me to credit it specifically, but I have to infer that those documents, which clearly were later the subject of the subpoenas, have been destroyed. The only reasonable inference is that the defendant was responsible for their destruction as a further effort at obstruction of justice in this case." Sent. Transcript, p. 69-70.

c.   *Charity Johnson*

Hagerman also argues that if WET employee Charity Johnson had been called as a witness, she would have "impeached the testimony of both Neill and Morrison." Hagerman does not specify what Johnson's testimony would be or provide an affidavit signed by Johnson. Hagerman's references to testimony of Neill and Morrison regarding their interactions with Johnson is insufficient to show what evidence she would have provided in support of his defense. *See Barkauskas*, 946 F.2d at 1295. He has therefore failed to show that his counsel was ineffective for failing to call Charity Johnson as a witness.

---

2 For similar reasons, the court does not find the affidavit of Mike Cooper to discredit trial testimony.

####   d.   *Terra Technologies*

Hagerman finally argues in his motion that a representative of Terra Technologies would have corroborated his testimony that the machine which tests phenol levels was never broken and that Morrison was providing him test results from that machine. According to Hagerman, this testimony would have contradicted the testimony of Morrison and Neill that an old machine was broken for several months leading up to August of 2004 and therefore no phenol test results were provided. Hagerman fails to provide an affidavit and speculates about what the testimony of a Terra Technologies representative would have been. This is insufficient to show ineffective assistance of counsel. *See Barkauskas*, 946 F.2d at 1295. In addition, even if the machine was working, what Morrison reported to Hagerman is what is relevant here. Morrison testified that he left the space on the bench sheets reserved for recording the phenol test results blank, but the evidence showed that Hagerman reported acceptable levels when he completed the DMRs and MMRs.

### 3.   Failure to question witnesses about relevant facts

Hagerman next asserts that counsel was ineffective for failing cross-examine witnesses regarding particular facts.

####   a.   *Scraps of Paper*

Hagerman first argues that his counsel was ineffective for failing to introduce scraps of paper that Hagerman alleges he received from Neill and Morrison containing their test results. Hagerman's defense was that he received those test results on scraps of paper and used those scraps to complete the DMR and MMRs. Hagerman contends in his § 2255 motion that he gave the scraps of paper to his trial attorneys but they failed to introduce them into evidence at trial. Hagerman argues that these scraps of paper support his testimony that he received test results from Neill and Morrison on scraps of paper and undermine Morrison's testimony that he did not provide results of his testing on scraps of paper.

In his § 2255 motion, Hagerman asserts that he "gave trial counsel various scraps of paper that were found in [his] office." However, at trial, Hagerman testified that he "threw away these scraps of paper . . . ." *Hagerman*, 525 F. Supp. 2d 1058, 1063 (S.D. Ind. 2007) aff'd, 301 F. App'x 552 (7th Cir. 2008). Specifically, Hagerman testified: "Q. Did you preserve those notes? A. No. Q. Did you, in the normal course of business, have any procedure for preserving those? A. No." Tr. 399. Hagerman's trial testimony that he did not preserve the notes contradicts his present argument that he gave these scraps of paper to trial counsel. Hagerman's argument in reply in support of his § 2255 motion that his trial testimony concerning his usual course of business cannot fairly be said to completely rule out the fact that any scraps of paper

were in his offices is unavailing. If he had given scraps of paper to trial counsel, then he should not have testified to the contrary. This assertion cannot be used to support his allegation that trial counsel was ineffective.

> b.      Other testimony

Hagerman claims that his trial attorneys were ineffective because they allegedly failed to question or effectively cross examine Neill and Morrison about the "difference in the results between Outfalls 101 and 001," the lack of QAQC books, and their understanding of the characteristics of phenol. Hagerman alleges that questioning Neill and Morrison on the difference between the results from the two outfalls done on the same day would have challenged their credibility. He argues that QAQC books are necessary to verify test results and that if trial counsel had questioned Neill and Morrison about why the books were not found at WET, it would have discredited their testimony. Finally, Hagerman argues that Neill testified that there was phenol in the tanks and it was sludgy and brown, whereas phenol is actually clear or pink, and that Morrison allegedly found phenol concentrations well over the odor threshold for phenol and trial counsel should have questioned Morrison regarding any odor or presented other evidence as to the lack of odor.

Deciding which questions to ask a witness is a matter of trial strategy. *Burns v. Hompe*, 339 F. App'x 624, 628 (7th Cir. 2009) (citing *United States v. Jackson*, 546 F.3d 801, 814 (7th Cir. 2008)). With respect to cross examination, "a wrong question, or series of them, in a criminal trial would seldom be considered as decisive elements of ineffective assistance." *Lane v. LeFerve*, 705 F.Supp. 88, 95 (N.D. N.Y. 1989). "[A] defendant has a 'burden of supplying sufficiently precise information,' of the evidence that would have been obtained had his counsel undertaken the desired investigation, and of showing 'whether such information ... would have produced a different result.'" *United States v. Rodriguez*, 53 F.3d 1439, 1449 (7th Cir. 1995) (quoting *United States v. Kamel*, 965 F.2d 484, 499 n. 45 (7th Cir. 1992))

Hagerman has not shown that the questioning he suggests would have produced a different result. First, Neill and Morrison are experienced lab technicians and Hagerman provides little evidence beyond his speculation what Neill's and Morrison's answers would have been to questions on these topics. It was a valid trial strategy not to quiz these witnesses on these issues. In addition, the issue at trial was what Hagerman knew when he completed the DMRs and MMRs. "Hagerman denied receiving reports of test results in any format other than post-it notes and scraps of paper. He also testified that he never saw the spreadsheets prepared by Neill and, indeed, had never received any test results from her showing unacceptable pollutant levels. But the EPA found spreadsheets in Hagerman's office." *Hagerman*, 301 F. App'x at 556. Hagerman's suggested cross-examination would have contributed little to the determination of what he knew when he completed the DMRs and MMRs and does not show that his trial counsel was ineffective.

**B.    Newly Discovered Evidence**

As another ground for relief in this § 2255 motion, Hagerman contends that he recently discovered that the spreadsheets Neill stated she created on her computer at WET and gave to Hagerman, were not created on her computer at WET. As evidence that the spreadsheets were not created on Neill's WET computer, Hagerman provides a letter from Jon Jones, technology consultant from Terre Haute, Indiana.

While presented in this § 2255 motion, Hagerman's claim of newly discovered evidence is more properly viewed as a motion for a new trial pursuant to Rule 33 of the *Federal Rules of Criminal Procedure*. Rule 33 permits a district court to grant a new trial on the basis of newly discovered evidence within 3 years of the verdict or finding of guilt. *Mankarious v. United States*, 282 F.3d 940, 945 (7th Cir. 2002). "§ 2255 and Rule 33 are utterly distinct procedural vehicles, each with its own rules and time limits." *United States v. Steele*, 72 F. App'x 478, 479 (7th Cir. 2003) (citing *United States v. Evans*, 224 F.3d 670, 671-73 (7th Cir. 2000)). "Rule 33 allows a defendant to seek a new trial within three years of conviction on the basis of newly discovered evidence supporting his innocence and is a part of the criminal proceeding; a motion under § 2255 on the other hand, is a collateral attack on a sentence based upon a claim that the conviction or sentence was in violation of the constitution or laws of the United States." *Id.* (internal citations omitted).

"Courts exercise great caution when considering a motion under Rule 33 to set aside a verdict on the basis of newly discovered evidence because of the importance accorded to repose, regularity of decision-making, and conservation of judicial resources." *United States v. Young*, 20 F.3d 758, 763 (7th Cir. 1994) (citing *United States v. Kamel*, 965 F.2d 484, 490 (7th Cir. 1992)). "A new trial is warranted only if [the movant] can show that the new evidence: 1) came to his knowledge only after trial; 2) could not have been discovered any sooner using due diligence; 3) is material and not merely impeaching or cumulative; and 4) probably would lead to an acquittal in the event of a new trial." *United States v. Hodges*, 315 F.3d 794, 801 (7th Cir. 2003).

First, the only evidence Hagerman provides of this newly discovered evidence is an unsworn letter from a technology consultant. This letter does not support Hagerman's arguments because it is not an affidavit sworn under the penalties for perjury. *See Prewitt v. United States*, 83 at 819 (7th Cir. 1996) ("[I]t is the rule of this Court that in order for a hearing to be granted, the petition must be accompanied by a detailed and specific affidavit which shows that the petitioner had actual proof of the allegations going beyond mere unsupported assertions.")

Next, even when considered, this proffered evidence fails to meet the elements required to seek a new trial. First, Hagerman has not shown that this new evidence could not have been discovered any sooner. While the timeframe was short, he learned of the existence of the spreadsheets four days before the trial and Neill testified about them at trial. According to the letter from Snodgrass, he reached the determination that the spreadsheets were not made on Neill's computer in a day. Hagerman made no effort to obtain this evidence until the filing of his § 2255 motion – almost three years after the conclusion of the trial. "If there is possible evidence which would exonerate a defendant, he may not simply ignore it, awaiting the outcome of the trial and having the opportunity of using that evidence later for a second chance for acquittal." *United States v. Kamel*, 965 F.2d 484, 493 (7th Cir. 1992) The defendant must make an effort to obtain the evidence. *See id.* ("Mr. Kamel undertook little or no effort, prior to his trial, to obtain the evidence that he now seeks to offer in his defense. In the absence of such steps, we conclude that Mr. Kamel has not shown the requisite 'due diligence' to justify the granting of his motion for a new trial."); *see also United States v. Oliver*, 683 F.2d 224, 228 (7th Cir. 1982) ("[A] defendant's 'claim of diligence is seriously undermined by the failure of the defense to have a subpoena issued for the witness or to request a continuance on the basis of [the witness'] unavailability.'") (quoting *United States v. Bryson*, 434 F.Supp. 986, 987 (W.D.Okla. 1977)).

In addition, whether or not the spreadsheets were created on Neill's computer is not the relevant question. The issue at trial was what Hagerman knew when he completed the DMRs and MMRs. The evidence at trial was that EPA agents found in Hagerman's office bench sheets that were not in Neill's or Morrison's writing and supported the numbers Hagerman reported in the DMRs and MMRs. In addition to these bench sheets, moreover, were several spreadsheet printouts that corroborated Neill's and Morrison's bench sheets and contradicted the reports.[3] *Hagerman*, 301 Fed. Appx. at 557.

### III. Conclusion

To warrant relief under ' 2255, the errors of which the movant complains must amount to a fundamental miscarriage of justice. *Davis v. United States*, 417 U.S. 333 (1974); *Hill v. United States*, 368 U.S. 424, 428 (1962). Hagerman has failed to show either deficient performance or prejudice in his attorneys= representation. *See United States v. Gonzalez-Lopez*, 548 U.S. 140, 147 (2006) ("The requirement that a defendant show prejudice in effective representation cases arises from the very nature of the specific element of the right to counsel at issue thereB*effective* (not mistake-free) representation. Counsel cannot be 'ineffective' unless his mistakes

---

3 The affidavit of Mike Cooper, presented for the first time in the movant's reply in support of his motion, is also unavailing. Whether the spreadsheets were contained in a folder that Cooper was missing is irrelevant. This issue was Hagerman's knowledge and those spreadsheets, regardless of where they were created or whose folder they were in showed different levels of pollutants that Hagerman reported.

have harmed the defense (or, at least, unless it is reasonably likely that they have)⑧). His attorneys were constitutionally sufficient throughout all proceedings. For the reasons explained above, therefore, Hagerman is not entitled to relief pursuant to 28 U.S.C. ' 2255. His ' 2255 motion is therefore **denied.**

### IV. Certificate of Appealability

Pursuant to Federal Rule of Appellate Procedure 22(b), Rule 11(a) of the Rules Governing § 2255 proceedings, and 28 U.S.C. § 2253(c), the court finds that Hagerman has failed to show that reasonable jurists would find "it debatable whether the petition states a valid claim of the denial of a constitutional right." *Slack v. McDaniel,* 529 U.S. 473, 484 (2000). The court therefore **denies** a certificate of appealability.

**IT IS SO ORDERED.**

Date: 12/20/2012 _____

LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Distribution:

All electronically registered counsel